# REDACTED

SCJ:PEN
F# 2017R01012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

XIAOLIANG ZHANG,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN MATTER OF THE SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS
ELMURST UNITED MEDICAL, P.C., 41-60
MAIN STREET, SUITE 201B, FLUSHING,
NEW YORK, 11355

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN MATTER OF THE SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS
ELMHURST UNITED MEDICAL, P.C., 45-02
82nd STREET, FIRST FLOOR, ELMHURST,
NEW YORK 11373

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

17 M 418

**TO BE FILED UNDER SEAL**

AMENDED
COMPLAINT AND
AFFIDAVIT IN SUPPORT OF
APPLICATION FOR AN
ARREST WARRANT
(18 U.S.C. § 1347)

AMENDED
AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A
SEARCH WARRANT
(18 U.S.C. § 1341, 1343 and 1347)

AMENDED
AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A
SEARCH WARRANT
(18 U.S.C. §§ 1341, 1343 and 1347)

EASTERN DISTRICT OF NEW YORK, ss:

             AGNIESKA ZAJAC, being duly sworn, deposes and states that she is a Special

Agent with the Department of Health and Human Services, Office of the Inspector General

("HHS-OIG"), duly appointed according to law and acting as such. Upon information and belief, in or about and between September 2012 and December 2016, within the Eastern District of New York and elsewhere, the defendant XIAOLIANG ZHANG, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

(Title 18, United States Code, Section 1347)

Upon information and belief, there is probable cause to believe that there are kept and concealed within the premises known and described as (1) ELMHURST UNITED MEDICAL, P.C., located at 41-60 MAIN STREET, SUITE 201B, FLUSHING, NEW YORK, 11373 ("SUBJECT PREMISES I") and (2) ELMHURST UNITED MEDICAL, P.C, located at 45-02 82nd STREET, FIRST FLOOR, ELMHURST, NEW YORK 11355 ("SUBJECT PREMISES II") (collectively, the "SUBJECT PREMISES"), property, as described on attachment A (appended hereto and incorporated herein), and other items, all of which constitute evidence, fruits and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347 (mail fraud, wire fraud and health care fraud).

The source of your affiant's information and the grounds for her belief are as follows:

1.      I have been an HHS-OIG Special Agent for approximately 15 years. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud

investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs and other health care benefit programs. I currently am assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs.

2.     I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities and (c) information obtained from witnesses.

3.     Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant for the defendant XIAOLIANG ZHANG, and search warrants for the SUBJECT PREMISES, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts, in substance and in pertinent part, which I believe are necessary to establish probable cause for the issuance of an arrest and search warrants.

THE MEDICARE AND MEDICAID PROGRAMS

4.     At all times relevant to this application, the Medicare program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid

Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Physicians who provided services to beneficiaries or ordered that services be provided to beneficiaries were referred to as "rendering physicians."

5.      At all times relevant to this application, the New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as "beneficiaries."

6.      Medicare and Medicaid were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

7.      Medicare included coverage under two primary components, hospital insurance ("Medicare Part A") and medical insurance ("Medicare Part B"). Medicare Part B covered the costs of physicians' services and outpatient care, including physical therapy, occupational therapy, chiropractic services and diagnostic tests. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

8.      Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid were physical therapy, occupational therapy and diagnostic tests. Generally, Medicaid covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

9.      Medical providers and suppliers that sought to participate in Medicare Part B and Medicaid and to bill Medicare and Medicaid for the cost of their treatment of Medicare and Medicaid beneficiaries, and related benefits, items and services, were required to apply for and receive, in the case of Medicare, a provider identification number ("PIN") or provider transaction access number ("PTAN") and, in the case of Medicaid, a maintenance management information system ("MMIS") number.  The PIN/PTAN/MMIS numbers allowed medical providers and suppliers to submit bills, known as claims, to Medicare and Medicaid, respectively, to obtain reimbursement for the cost of treatment, and related health care benefits, items and services, which they had supplied or provided to beneficiaries.

10.     Medical providers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services.  By submitting a claim, the provider certified, among other things, that the services were rendered to the patient and were medically necessary.

11.     Providers submitted claims to Medicare and Medicaid using billing codes, also called current procedural terminology or "CPT" codes, which are numerical codes that refer to descriptions of the medical procedures and services provided to beneficiaries.

THE DEFENDANT AND HIS COMPANY

12.     The investigation has revealed that in or about and between approximately SEPTEMBER 2012 and December 2016, the defendant XIAOLIANG ZHANG was a licensed physician who, according to the New York State Department of State, was the sole owner of Elmhurst United Medical, P.C. ("Elmhurst PC"), which is a New York corporation that maintained offices at the SUBJECT PREMISES.

6

13.    The defendant XIAOLIANG ZHANG has been a Medicare provider since
at least 2008. On April 14, 2014, a Medicare Enrollment Application signed in ZHANG'S name
was received by Medicare to re-validate ZHANG's registration. On this application, ZHANG's
specialty was listed as "Physical Medicine and Rehabilitation," a specialty that is known as
physiatry. The application listed ZHANG's "practice locations" as the SUBJECT PREMISES
and the contact person for the practice as "XIAOLIANG ZHANG" with an address at SUBJECT
PREMISES I. Under Section 8 of the application, which requires identification of any "billing
agency or individual that you contract with to prepare or submit your claims," a box was checked
indicating "section did not apply." This meant that ZHANG was responsible for submitting his
own Medicare claims. In signing the application, ZHANG certified in Section 15 that, "I will
not knowingly present or cause to be presented a false or fraudulent claim for payment by
Medicare, and will not submit claims with deliberate ignorance or reckless disregard for their
truth or falsity."

14.    According to an electronic funds transfer authorization agreement with
Medicare, signed in the name of "XIAOLIANG ZHANG," dated June 25, 2015, Medicare was
directed to deposit funds paid in satisfaction of ZHANG's Medicare claims to an account located
at TD Bank, ending in "0597." Records obtained by TD Bank reveal that between January 3,
2012 and January 3, 2017, Medicare deposited $1,876,141.00 into this account. Further
investigation revealed that these funds were transferred to a second TD Bank account ending in
"7616," which was in the name of Elmhurst PC.

THE SUBJECT PREMISES

15.    I visited SUBJECT PREMISES I on June 23, 2017, which was a day that
the office was routinely closed. Access to SUBJECT PREMISES I is gained through the

entrance of the building depicted in the photograph attached as Exhibit A. This entrance is labeled "Landmark Bldg. 41-60." SUBJECT PREMISES I is located on the second floor of the building depicted in paragraph A. Next to the glass front door to SUBJECT PREMISES I is a sign which bears the name "XIAOLING ZHANG" and an arrow pointing to the front door. The glass front door contained a posting of the office's hours of operation, among other notices. I looked through the glass front door and observed a reception desk, which had bookcases behind it with what appeared to be patient files.

      16.     I also visited SUBJECT PREMISES II on June 23, 2017, also a day when the office was routinely closed. SUBJECT PREMISES II is located on the first floor of the building depicted in the photograph attached as Exhibit B. Although the address for SUBJECT PREMISES II is on 82nd Street, the entrance to SUBJECT PREMISES II is on 45th Avenue. The awning above SUBJECT PREMISES II read, "ELMHURST MEDICAL CENTER." The glass front door to SUBJECT PREMISES II contained a posting of the office's hours of operation, among other notices. I looked through the glass front door and observed a reception desk, which had bookcases behind it containing what appeared to be patient files.

      17.     I examined the website https://www.zocdoc.com/doctor.xiaoliang-zhang-md-2923. On this website, the defendant XIAOLIANG ZHANG offers on-line appointments for his offices located at SUBJECT PREMISES I and SUBJECT PREMISES II at least through August 2017. This indicates that ZHANG is currently practicing at the SUBJECT PREMISES. This website also advertised that ZHANG accepted a variety of insurance from private companies.

## PROBABLE CAUSE

18.    Cooperating Witness One ("CW1") is a licensed physical therapist who worked for the defendant XIAOLIANG ZHANG at Elmhurst PC between September 2012 through December 16, 2016.  CW1 primarily worked at SUBJECT PREMISES I, which CWI identified as the premises depicted in Exhibit A.  CW1 has pleaded guilty, pursuant to a cooperation agreement, to conspiracy to commit health care related to CW1's work for ZHANG at Elmhurst PC.  Information provided by CW1 has proven to be reliable and is corroborated by statements of other witnesses, tape-recorded conversations with ZHANG and Medicare and Medicaid claims data.   CW1 did not submit claims to Medicare and Medicaid for the physical therapy that CW1 administered at Elmhurst PC.  Rather, CW1 was paid a salary by ZHANG, and ZHANG submitted all the claims to Medicare and Medicaid under his name.

19.    According to CW1, the defendant XIAOLIANG ZHANG was a physiatrist, who operated outpatient physical therapy clinics at the SUBJECT PREMISES under the name of Elmhurst United Medical, P.C.  ZHANG oversaw the billing process for Elmhurst PC with the assistance of an office manager and a secretary.  I have examined Medicare and Medicaid claims data related to physical therapy CPT codes, which shows that ZHANG submitted a combined total of $21,383, 725.36 worth of claims for reimbursement to Medicare and Medicaid between January 1, 2013 and December 31, 2016.  Of those claims, Medicare and Medicaid paid ZHANG a combined total of $7,126,342.87.

20.    CW1 indicated that the defendant XIAOLIANG ZHANG worked at SUBJECT PREMISES I on Monday afternoons; Tuesdays, Wednesdays and Saturdays from approximately 11:30 a.m. until closing at approximately 6:00 p.m.; and Thursdays and Saturdays from 11:30 a.m. to 4:00 p.m.  CW1's working hours at SUBJECT PREMISES I were Monday

through Thursday and Saturday from 9:30 a.m. through 6:00 p.m. CW1 said that CW1 was the only licensed physical therapist working at SUBJECT PREMISES I from September 2012 until approximately January 2015, when ZHANG hired a licensed physical therapy assistant ("PTA"). PTAs can provide physical therapy under the supervision of a physical therapist. CW1 did not observe ZHANG providing physical therapy to patients to any significant degree, although CW1 observed him meeting with patients prior to prescribing physical therapy.

21.     CW1 states, between September 2012 and December 16, 2016, the defendant XIAOLIANG ZHANG engaged in a fraudulent scheme through which ZHANG submitted and caused to be submitted claims to Medicare and Medicaid for physical therapy even though such services were not medically necessary, were often not provided, and otherwise did not qualify for reimbursement.

22.     Specifically, CW1 stated that the defendant XIAOLIANG ZHANG submitted and caused to be submitted false and fraudulent claims to Medicare and Medicaid reflecting that physical therapy had been provided to patients by licensed physical therapists when, in fact, such services either had not been provided or had not been provided in the amount claimed. Rather, patients were typically ushered to staff members, who were not physical therapists, for short massages and other treatment, including the application of heat packs that were not eligible for reimbursement by Medicare and Medicaid.

23.     As a further part of the fraudulent scheme, CW1 stated that the defendant prepared and caused to be prepared paperwork documenting that "attended" electrical stimulation treatments, which require the constant attention of a licensed physical therapist or physician, had been performed on Medicare and Medicaid beneficiaries, when, in fact, electrical stimulation treatments were not administered by a licensed physical therapist or physician.

24.     Specifically, CW1 further stated that patients awaiting physical therapy signed their name on a sign-in sheet and were called on a first come, first served basis. CW1 states that SUBJECT PREMISES I consisted of a four-room office containing (1) a reception/waiting area, (2) ZHANG's office, (3) a physical therapist office and (4) a large treatment room with multiple treatment beds.

25.     CW1 stated that, when new patients came to the office, the office staff verified their insurance coverage. The patients were then examined by the defendant XIAOLIANG ZHANG, who would refer them for physical therapy. ZHANG's examination often measured, among other things, a patient's range of motion, meaning a patient's range of movement around a joint. During the initial examination, ZHANG prepared a handwritten paper report, which CW1 believes was then placed in a paper patient file. The paper patient files were stored on shelves behind the reception desk. Subsequently, an electronic medical record was created in MDLand, a computer program used to maintain electronic medical records at Elmurst PC. CW1 stated that MDLand was also used by the billing secretary to process Medicare and Medicaid claims. After the initial evaluation, in addition to presecribing physical therapy, ZHANG also scheduled patients to return once a month for a follow-up examination with him. In addition, ZHANG would perform nerve conduction ("EMG") and ultrasound tests on patients with the help of a staff member who told CW1 that she was not a license health care provider. ZHANG also routinely administered what CW1 believed to be steroid injections to his patients.

26.     On March 9, 2016, a confidential source ("CS"), under the supervision of a special agent of the Federal Bureau of Investigation, went to SUBJECT PREMISES I and had an appointment with the defendant XIAOLIANG ZHANG. CS made a consensual audio/video

recording of CS's interaction with ZHANG.  The following is draft transcript reflecting the sum

and substance of CS's initial interaction with ZHANG:

| | |
|---|---|
| ZHANG: | Hi, how are you . . . how can I help you? |
| CS: | Need massage.  Massage. |
| ZHANG: | Yeah, where's the pain? |
| CS: | Mmm? |
| ZHANG: | Where's the pain? |
| CS: | Mmm, actually though, not really pain but some pain here and some pain here. |
| ZHANG: | Okay, some pain in the lower back and the neck. |
| CS: | Not much. |
| ZHANG: | Not much. |
| CS: | I want massage.  Massage . . . everything. |
| ZHANG: | Who introduce you to me? |
| CS: | Uh, my friend. |
| ZHANG: | Your friend? |
| CS: | Park.  Last name Park. |
| ZHANG: | [ZHANG touches CS].  Pain?  Yeah. |
| CS: | [Grunts]. |
| ZHANG: | Oh, a little bit.  Okay, stand up.  Let me see your back.  Pain? |
| CS: | [Grunts]. |
| ZHANG: | Not that much.  Sit down . . . .  Okay, we're going to be starting the therapy.  Any other medical issue?  High blood pressure, diabetes, no?  Hypertension, hypertension, blood   pressure, no? |
| CS: | High blood pressure. |
| ZHANG: | High blood pressure.  Anything else? |
| CS: | Mmm. |
| ZHANG: | Surgery? |
| CS: | [Shakes head sideways] Mmm. |
| ZHANG: | Smoke, drink, no?  Allergy to medication, no? |
| CS: | [Shakes head sideways] Mmm. |
| ZHANG: | Ummm, you retire right? |
| CS: | [Shakes head up and down] Mmm. |
| ZHANG: | Okay, come. |

After this interaction, ZHANG referred CS to CW1 for physical therapy.  CW1, however, did not

treat CS; rather CS was given treatment by other staff members, who were not licensed physical

therapists.  A staff member attempted to give CS an electrical stimulation treatment, but CS

resisted.  The staff member explained that CS had to have electrical stimulation and heat packs

for the "insurance," but that the massages and acupuncture were free.   Based upon my training and experience, there is reason to believe that the brief interaction between CS and ZHANG was not sufficient to justify ZHANG's referring CS for physical therapy.   ZHANG's response to CS's request for a massage, which resulted in ZHANG asking CS who referred CS to the office, suggested that ZHANG was leery of potential outside investigation of his practice by insurance companies or law enforcement.   The fact that a staff member told CS that the massages and acupuncture were free, showed that ZHANG enticed patients to the office for massages and acupuncture so that ZHANG could use the patients' insurance information to submit claims for reimbursement to Medicare and Medicaid for physical therapy that was not rendered or, if rendered, was not in the amount claimed.   I reviewed ZHANG's claim submission for CS's treatment on March 9, 2016.   ZHANG billed Medicare for attended electrical stimulation, manual therapy and therapeutic exercise, all of which allegedly was administered by a physical therapist.   None of that treatment happened.

27.     When the defendant XIAOLIANG ZHANG referred a patient to CW1 for physical therapy, based upon the standard of CW1's profession, CW1 was required to evaluate the patient's condition.   After this evaluation, CW1 was supposed to create an individualized plan of physical therapy.   CW1 knew that physical therapy billed to Medicare or Medicaid must be administered by a physician, licensed physical therapist or licensed PTA under the supervision of a physical therapist.   CW1 used MDLand to create physical therapy reports and progress notes ("PT notes") and to input physical therapy CPT codes that would be used by ZHANG to bill Medicare and Medicaid for each patient's treatment.

28.     Moreover, CW1 stated that, when CW1 conducted a physical evaluation of the patient, CW1 noticed that CW1's evaluation of the patient's physical condition often did

not show the level of impairment indicated by the defendant XIAOLIANG ZHANG in his initial evaluation. For example, a patient's range of motion would be less impaired than that noted by ZHANG. CW1 also stated that patients often did not complain of the problems the ZHANG had diagnosed.

29.     CW1 stated that between September 2012 and approximately January 2015, the number of patients coming through SUBJECT PREMISES I for "treatment" grew from an average of approximately 40 to 60 patients per day in 2012 to approximately 80 to 100 patients per day by January of 2015. CW1, though, only had the capacity to provide physical therapy to approximately 15 patients a day. Other than ZHANG, CW1 was the only person qualified to administer physical therapy in the office up until January 2015, when the PTA was hired. Even with the help of the PTA, the vast majority of patients that came to SUBJECT PREMISES I did not receive physical therapy. Moreover, CW1 stated that CW1 rarely had time to conduct physical therapy evaluations or required re-evaluations.

30.     CW1 further stated that, nonetheless, when CW1 began her employment, and on a continuing basis throughout, the defendant XIAOLIANG ZHANG instructed CW1 to input into MDLand four CPT codes for each patient, which indicated that the patient received "attended" electrical stimulation treatment, and either two manual therapy treatments and one therapeutic exercise treatment or one manual therapy treatment and two therapeutic exercise treatments (the "mandated CPT codes"). CW1 understood that ZHANG's billing secretary would submit claims containing the mandated CPT codes to Medicare and Medicaid for reimbursement. Finally, CW1 stated that the use of the mandated CPT codes was generally the same for each patient without regard for a patient's need for the treatment or an individualized treatment plan.

31.    CW1 further stated that very few patients actually received the physical therapy identified by the mandated CPT codes. Instead, the vast majority of patients were given massages by individuals who were not licensed physical therapists. CW1 stated that massages are a tool used by physical therapists, and they can be reimbursed by Medicare and Medicaid as "manual therapy." ZHANG's patients' massages did not qualify as reimbursable manual therapy, because the massages were not administered by a licensed physical therapist or PTA. Also, the massages were not therapeutic, meaning they were not designed to alleviate a medical problem. CW1 also said that few patients received therapeutic exercise, and, if they did, it was not under a physical therapist's supervision as required by the CPT Code used to bill Medicare and Medicaid.

32.    CW1 stated that, while patients were given electrical stimulation treatments, the treatments were not administered by a licensed physical therapist. Moreover, the electric stimulation was not "attended." "Attended" electrical stimulation means that a physical therapist administered the electrical stimulation throughout the treatment. CW1 stated that ZHANG, nonetheless, instructed CW1 to bill Medicare and Medicaid as if CW1 had performed "attended" electrical stimulation on each patient. CW1 stated that Medicare and Medicaid will only reimburse for "attended' electrical stimulation.

33.    CW1 further stated that the majority of CW1 and the PTA's day was spent producing PTnotes, rather than providing physical therapy to patients. PT notes generally include, for example, an assessment of a patient's condition, such as range of motion, the degree to which the patient tolerated physical therapy and a plan for meeting therapy goals. For most patients, the PT notes were inaccurate, because the patients did not receive the physical therapy described in the notes.

34. CW1 recalled a time when a physical therapist who worked at SUBJECT PREMISES II was on vacation. ZHANG instructed CW1 to prepare PT notes for patients that were "treated" at SUBJECT PREMISES II, even though CW1 never went to SUBJECT PREMISES II to see those patients.

35. Moreover, CW1 stated that the defendant XIAOLIANG ZHANG chastised CW1 for the fact that CW1, to the extent that CW1 treated a patient, would accurately report a patient's level of pain in CW1's PT notes. I am aware that pain is reported on a scale from 0 to 10, with 10 being the worst pain. ZHANG required CW1 to report every patient's level of pain as at least 5, even when the patient's pain was less. CW1 believed ZHANG's instruction to falsify pain levels was meant to induce Medicare and Medicaid to pay claims for patients who did not require treatment.

36. CW1 stated, at one point, ZHANG created a template for PT notes to justify the CPT codes being billed and instructed CW1 simply to change the measures of progress, such as range a motion, to make it appear that the patient was improving from treatment.

37. Based upon instructions by law enforcement, on November 17, 2016, CW1 engaged the defendant XIAOLIANG ZHANG in a consensually recorded conversation regarding ZHANG's billing practices. CW1 had just been instructed by the billing secretary to reduce her billings to three CPT codes per patient rather than the usual four. During the conversation, CW1 questioned ZHANG as to why she was instructed to lower her billings from four codes to three, while expressing concern that this change might make CW1 vulnerable to insurance company scrutiny. A draft transcript of the sum and substance of a portion of this conversation is as follows:

CW1:      Okay. How about those, uh, previous notes? We did a lot of 4. I'm worried about the insurance coming to me and ask me, you know.

ZHANG:    Uh, I'm gonna check because I don't want to take that responsibility, too, but – but this is what – we already tried a – a therapy on the patient, but I'll see. I'll – I'll decide in the _____, see what – what's going on at that day, how many patients come in and how much we do. And then we'll – you know the billing, the last – last minute I will give the biller the instruction, how to – how to deal with that bill.

CW1:      Okay.

ZHANG:    Rather looking back, because, like, the issue – ███, the issue is we are coming too many patients now. I don't know where the patients _____.

CW1:      That's why I'm – I'm worried, doc, about that, a lot of, uh, patients and, uh

ZHANG:    The billing is under my name, so _____ _____ anything I will – I shall take the responsibility.

CW1:      You sure?

ZHANG:    Yeah.

CW1:      I'll just follow what – I'll just follow what you want to say.

CW 1 said that, during the first part of the conversation, when CW1 told ZHANG about CW1's concern about the insurance companies, ZHANG advised CW1 that he too was concerned. ZHANG noted that the office was getting too many patients to justify his billings, meaning the mandated CPT codes. I believe that ZHANG worried that insurance companies would determine that, given the size of ZHANG's staff, it would be impossible for the practice to render four physical therapy treatments to such a large a number of patients in a single day. As a result, ZHANG stated that he would adjust the number of CPT codes billed per patient depending on the number of patients seen that day. Based upon my training and experience, and knowledge of

the requirements of Medicare and Medicaid billing codes, I believe that ZHANG's conversation

shows that his billings were pre-determined and indiscriminate and had no regard for a patient's

true condition or need for treatment.

        38.     During a later part of the conversation, CW1 advised the defendant

XIAOLIANG ZHANG that a physical therapist could not treat 80 to 100 patients per day.

ZHANG's response, in substance, was that he could say that CW1 was supervising four other

licensed therapists.  A draft transcript of the sum and substance of this conversation is as follows:

| | |
|---|---|
| CWS: | Each PT see, like, 18 patients a day. I think that's doable, but – |
| ZHANG: | No, but – but I told you – |
| CWS: | 60 to 80 is too much. |
| ZHANG: | No. That – that's _____ the therapy I will get. You are able to supervise four to five patients at the same time for _____ _____. |

When CW1 stated during this conversation that a physical therapist could treat at most 18

patients a day and that 60 to 80 patients per day was "too much," ZHANG responded that he

would tell the insurance companies that CW1 was supervising four or five patients at a time,

which was not the case.  In yet another portion of the conversation, ZHANG admitted that he did

not want to pay for a staff large enough to treat all of their patients.  A draft transcript of this

conversation is as follows:

| | |
|---|---|
| CW1: | You need to hire one PT, one PTA, four people here. |
| ZHANG: | No, I don't want, because – |
| CW1: | You don't want. Too much? |
| ZHANG: | Too much. This is, number one, there's too many for you _____ _____. And, uh, number two, I don't want that many patients come. That – that's the goal. What – what this is doing _____. You see, every day I have no life. Every night I – I come in and I have to go to the _____ _____. |

[Inaudible].People going home to sleep. I'm going home and still have work to do. [Inaudible] So right now I – I already _____ _____.

During this part of the conversation, CW1 advised ZHANG that he would need one additional physical therapist and one other PTA to handle the volume of patients that were coming to the office. ZHANG advised CW1 that he did not want to pay for that much staff.   He also added that he did not want to increase the number of therapists, because it would be too many people for CW1 to supervise and too many people for ZHANG to see himself.   In yet another part of the conversation, ZHANG also explained that, while some days might have the number of patients to justify such a full staff, other days would not.  ZHANG did not want to pay a staff that was not fully utilized every day.

39.    Cooperating Witness Two ("CW2") is a licensed physical therapist who worked for the defendant XIAOLIANG ZHANG at Elmhurst PC from November 2013 through December 2014.  CW2 worked primarily at SUBJECT PREMISES II, which CW2 identified as the premises depicted in Exhibit B.  CW2 has pleaded guilty, pursuant to a cooperation agreement, to health care fraud conspiracy related to CW2's work for a different physician in an unrelated practice.  Information provided by CW2 has proven to be reliable and is corroborated by statements of other witnesses, tape-recorded conversations with ZHANG and Medicare and Medicaid claims data.  CW2 did not submit claims to Medicare and Medicaid for the physical therapy that CW2 administered at Elmhurst PC.  Rather, CW2 was paid a salary by ZHANG and ZHANG submitted all the claims in his own name.

40.    During the time CW2 worded for the defendant XIAOLIANG ZHANG, ZHANG worked at SUBJECT PREMISES II on Tuesdays from 4:00 p.m. to 7:00 p.m. and Saturdays from 6:00 p.m. to 7:00 p.m.  Further, ZHANG occasionally worked at SUBJECT

PREMISES II on Mondays, Wednesdays, and Fridays. CW2's working hours, with minor adjustments over time, were Mondays from 4:00 p.m. to 7:00 p.m.; Tuesdays from 10:00 a.m. through 7:00 p.m.; Wednesdays from 10:00 a.m. through 7:00 p.m.; Thursdays from 10:00 a.m. through 7:00 p.m.; Fridays from 10:00 a.m. through 7:00 p.m. and Saturdays from 1:00 p.m. through 7:00 p.m. While CW2 worked at SUBJECT PREMISES II, CW2 was the only licensed physical therapist in the office, and there were no PTAs. CW2 did not observe ZHANG administer physical therapy to any significant degree. CW2 stated that SUBJECT PREMISES II consisted of a reception/waiting area, which lead to a hallway from where entrance was gained to (1) a bathroom, (2) an office, (3) a treatment room and (4) a washer/dryer area.

42.    While C2 worked primarily at SUBJECT PREMISES II, CW2 provided information similar to what CW1 provided regarding the defendant XIAOLIANG ZHANG's treatment and billing practices. CW2 advised that CW2 worked for a short time at SUBJECT PREMISES I. During that time, CW2 observed that both practice locations operated in a similar fashion. In addition, CW1 advised that the clinics shared the same office manager and billing secretary.

42.    CW2 stated that, when CW2 worked at Elmhurst PC, the defendant XIAOLIANG ZHANG engaged in a fraudulent scheme through which ZHANG submitted and caused to be submitted claims to Medicare and Medicaid for physical therapy treatment, even though such services were not medically necessary, were often not provided, and otherwise did not qualify for reimbursement.

43.    Specifically, CW2 stated that the defendant XIAOLIANG ZHANG submitted and caused to be submitted false and fraudulent claims to Medicare and Medicaid reflecting that physical therapy had been provided to patients by licensed physical therapists

when, in fact, such services either had not been provided or had not been provided in the amount claimed. Rather, patients were typically ushered to staff members who were not licensed physical therapists for massages and other treatment, including the application of heat packs, that were not eligible for reimbursement by Medicare and Medicaid.

44.     As a further part of the fraudulent scheme, CW2 stated that the defendant prepared and caused to be prepared paperwork documenting that "attended" electrical stimulation treatments, which require the constant attention of a physical therapist or physician, had been performed on patients, when, in fact, electrical stimulation treatments were given without the attention of a physical therapist or physician.

45.     Specifically, CW2 stated, that when new patients came to SUBJECT PREMISES II, they were examined first by the defendant XIAOLIANG ZHANG, who would then refer them for physical therapy. CW2 stated that the reports of ZHANG's examinations often measured, among other things, a patient's range of motion, meaning a patient's range of movement around a joint. CW2 stated that both paper files and electronic medical records stored in MDLand were maintained for each patient, and that the paper files were kept on shelves behind the reception desk. CW2 stated that all physical therapy reports were input through MDLand. CW1 further stated that, when a patient came to SUBJECT PREMISES II for physical therapy, they did not need an appointment; rather they signed their name to a sign-in sheet and were called on a first come, first served basis. CW2 stated that the sign-in sheets were kept in a binder in the washer/dryer area.

46.     CW2 stated that, between November 2013 and December 2014, more patients came to SUBJECT PREMISES II per day than CW2 was able to treat. CW2 stated that, in a typical day 50 patients would come to SUBJECT PREMISES II to see ZHANG and/or for

physical therapy. CW2 stated that ZHANG administered steroid injections and prescribed anti-inflammatory medications for many patients. Based upon CW2's observations and statements from patients, CW2 believed that most patents did not need the injections. CW2 further stated that ZHANG's reports almost always showed a range of motion impairment of 80%, when, in fact, CW2 often did not find that degree of impairment. Nonetheless, ZHANG instructed CW2 that, when CW2 wrote a PT note, CW2 should copy the range of motion findings from his original evaluation and then change them to make it appear that the patient was incrementally improving with each visit. CW2 further stated that many patients did not need physical therapy and should have been discharged from further therapy. ZHANG, however, forbid CW2 from discharging patients until their insurance benefits were depleted.

47.     CW2 stated that, of the approximate 50 patients that came to SUBJECT PREMISES II on a typical day, she would provide physical therapy treatment to only approximately 15 of those patients. The remaining patients, according to CW2, received massages and heat packs, which were not administered by a physical therapist. Nonetheless, ZHANG instructed CW2 to submit bills for those patients as if they were treated by a physical therapist.

48.     CW2 further stated that when CW2 began her employment, and on a continuing basis throughout, the defendant XIAOLIANG ZHANG instructed CW2 to bill Medicare and Medicaid for the treatment of patients in substantially the same manner, regardless of the true condition of the patient or the need for the treatment. ZHANG instructed CW1 to cause bills to be submitted to Medicare and Medicaid, which indicated that each patient received at least four physical therapy treatments that, according to Medicare and Medicaid requirements, had to be rendered by a physical therapist. Accordingly, ZHANG instructed CW2 to cause bills

to be submitted to Medicare and Medicaid for each patient that contained CPT codes for assisted electrical stimulation, and either two manual therapy treatments and one therapeutic exercise treatment or one manual therapy treatment and two therapeutic exercise treatments (the "mandated CPT codes").

49.     CW2 stated that the majority of CW2's workday was spent producing PT notes.  CW2 stated that the defendant XIAOLIANG ZHANG understood that most of the patients for whom CW2 was producing PT notes were not treated by CW2 and that CW2 had no personal knowledge of the patient's condition.  Moreover, in 2013, CW1 was temporarily absent from SUBJECT PREMISES I due to a medical problem.  During that time, CW2 filled in for CW1 at SUBJECT PREMISES I.  CW2 stated that, while 100 patients came to the office in one day, CW2 only treated a small percentage of those patients.

50.     CW2 states that, at the end of each day, CW2 copied the day's sign-in sheet to keep track of the days CW2 worked at SUBJECT PREMISES II.  CW2 stated that the SUBJECT PREMISES II was usually open for business prior to CW2's arrival.  By the time CW2 arrived, staff members had already starting "treating" patients.  Yet the defendant XIAOLOIAN ZHANG instructed CW2 to prepare PT notes for these patients.  CW2 would make a notion on the sign-in sheet to indicate which patients had been "treated" before CW2's arrival.  A copy of one such sign-in sheet is attached as Exhibit C.  CW2 stated that the names "Susan" and "Jing," which were written on the top of the sheet were staff members who were not licensed physical therapists or PTAs.  Yet, the "treatment" Susan and Jing rendered was billed to Medicare and Medicaid as physical therapy.   The numbers next to Susan and Jing's names indicated the number of patients that each of them "treated."

51.     I obtained an audit report from Health First, which is a manage care organization for Medicare and Medicaid.  Health First found that many PT notes for ZHANG's patients were insufficient, because they did not clearly state who had rendered the treatment and numerous notes were identical to each other.  The report also found that the injections that ZHANG provided to patients were often not justified.

52.     I requested a review of the defendant XIAOLIANG ZHANG's Medicare and Medicaid billing data from Medicare-Medicaid Data Match program "Medi-Medi," which is a contract Medicare auditor.   Medi-Medi performs audits of Medicare and Medicaid billings. The billings reviewed by Medi-Medi included patients treated at both offices of Elmhurst PC. The purpose of the analysis was to identify "impossible days."  An impossible day means a day in which it would be impossible for a physician, physical therapist or PTA to perform all of the treatment listed in claims submitted to Medicare and Medicaid on a particular day.  Impossible days were determined by adding up the treatment times for three physical therapy CPT codes that required a minimum amount of time for completion.  Any day that contained in excess of 16 hours of treatment was deemed an impossible day.

53.     The Medicare and Medicaid data submitted to the Medi-Medi ranged from January 1, 2013 through May 27, 2017.  The analysis showed that 1331 out of 1466 days within this billing range were "impossible."  The total amount paid to the defendant XIAOLIANG ZHANG by Medicare and Medicaid for the selected CPT codes on these impossible days was $1,603,897.38.  Moreover, when this data was examined chronologically, it corroborated CW1's information that the average number of patients rose from approximately 40 to 60 per day in 2012, when CW1 first started working at SUBJECT PREMISES I, to approximately 80 to 100 per day by January 2015.

54.    Finally, the analysis showed that the number of hours each day that exceeded the 16 hours day was a large amount.  For example, on December 27, 2014, the data showed that the ZHANG billed Medicare and Medicaid for the provision of 109.87 hours of treatment.  On May 2, 2015, ZHANG billed for 108.13 hours of treatment.  On December 13, 2014, ZHANG billed for 103.7 hours of treatment.   On April 18, 2015, ZHANG billed for 99.44 hours of treatment.  I have attached as Exhibit D a chart showing, in descending order, the top first 46 days that showed the highest number of hours billed per day.

55.    Because the billing data encompassed billings from both offices of Elmhurst PC, it captured billings, for example in 2014, when both CW1 and CW2 were working at Elmhurst PC.  Yet, even adding together the total number of hours of physical therapy that CW1 and CW2 combined could have provided in one day, the impossible day hours far exceeded CW1 and CW2's combined hours.  For example, on October 25, 2014, according to the data, ZHANG billed Medicare and Medicaid for 82.38 hours of treatment.  Even if CW1 and CW2 each provided 16 hours of therapy that day, for a combined total of 32 hours, the total number of treatment hours billed by ZHANG exceeded 32 hours by 50.38 hours.  Even if one assumed ZHANG provided another 16 hours of treatment, which, if combined with CW1 and CW2's hours, for a combined total of 48 hours, the total number of treatment hours billed by ZHANG exceeded 48 hours by 34.38 hours.

56.    Based upon the forgoing, there is probable cause to believe that the defendant XIAOLIANG ZHANG engaged in a health care fraud scheme to submit claims for reimbursement to Medicare and Medicaid for physical therapy even though such services were not medically necessary, most often were not provided, and otherwise did not qualify for reimbursement, in violation of Title 18, United States Code, Section 1347.

PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

57.     Based upon the forgoing, there is probable cause to believe that an examination of Elmhurst PC and the defendant XIAOLIANG ZHANG's business, financial, personnel and insurance records, in addition to patient files, as detailed in attachment A, located in the SUBJECT PREMISES will provide evidence, fruits and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347.

58.     Based on my knowledge, training and experience, and the experience of other law enforcement officers, I have knowledge of common business practices of medical providers.  In particular, I am aware that medical businesses routinely document and maintain records of their operating accounts - both in hard copy and electronically - including the receipt, expenditure and accounting of business funds.  Businesses also maintain detailed records of their business activities, including with respect to patients, vendors, lenders and employees.

59.     Based on my knowledge, training and experience, businesses billing Medicare and Medicaid, as well as private insurers, also routinely maintain records of patient files, sign-in sheets, bills, invoices and claims for payments/reimbursements for services billed, provided, or alleged to have been provided.  In fact, I am aware that federal law requires physicians to maintain medical records for 5 years; New York State requires retention for 6 years. These documents include reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patient's diagnosis, proof of delivery of services and/or items that were submitted by Elmhurst PC and the defendant XIAOLIANG ZHANG to Medicare, Medicaid and private insurers, or any representative acting on his behalf, that were based upon false claims for reimbursement by Medicare, Medicaid and private insurers.

60.     Based on my knowledge, training and experience, businesses billing Medicare, Medicaid and private insurers also retain contracts, agreements, papers and affiliated records pertaining to the provision of diagnostic services, including manufacturer catalogs, lists of billing codes, purchase orders, invoices and receipts.

61.     Based on my knowledge, training and experience, businesses billing Medicare, Medicaid and private insurers also retain letters relating to efforts to collect co-payments and deductibles from individuals that receive health care coverage from Medicare, Medicaid and private insurers.  In addition, businesses retain correspondence and cancelled checks relating to notices of overpayment and requests for refunds from Medicare, Medicaid and private insurers.  Businesses billing Medicare, Medicaid and private insurers also have correspondence to and from Medicare, Medicaid and private insurers including, but not limited to, manuals, advisories, newsletters, bulletins and publications.  Businesses also retain correspondence to and from patients regarding Medicare, Medicaid and private insurers.

62.     Based on my knowledge, training and experience, the financial books, records and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds, or bond funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM and debit card accounts are also retained by businesses.

63.     Based on my knowledge, training and experience, contracts, agreements, logs, lists or papers affiliated with medical professional services, referrals or storage, including records of payment, are also retained by businesses.

64.     Based on information provided by CW1 and CW2, Elmhurst PC and the defendant XIAOLIANG ZHANG uses MDLand, a cloud-based electronic health record system

any named MDLand.   Therefore, all contracts, agreements or paper affiliated with MDLand are relevant.

65.    Based on my knowledge, training and experience, medical offices often maintain IT servers, an accounting department and administrative offices, which contain common business records including, but not limited to, patient records, billing records, personnel records and financial records – all of which are relevant to the fraudulent schemes.

## TECHNICAL TERMS

56.    Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

57.    As described above and in Attachment A, this application seeks permission to search for records that might be found within the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

58.    *Probable cause*.  I submit that if a computer or storage medium is found within the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they

have been downloaded onto a storage medium, deleted or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the operating system or application operation, file system data structures and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29

e.      Based on actual inspection of other evidence related to this investigation and statements of CW1 and CW2, I am aware that computer equipment was used to generate, store and print documents used in part to submit false claims to Medicare and Medicaid as part of a health care fraud scheme.  There is reason to believe that there is a computer system currently located within the SUBJECT PREMISES contain evidence, fruits and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347.

59.    *Forensic evidence.*  As further described in Attachment A, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium within the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can record information about dates when files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, anti-virus, spyware and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that is connected with the computer and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

32

  d. The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  60. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

  61. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

62.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

63.    Elmhurst PC, ("the Company") is a medical practice that is an ongoing business.  The seizure of the Company's computers may limit the Company's ability to continue to provide medical care.[1]  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's medical practice.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

---

1   After the defendant XIAOLIANG ZHANG is arrested, his ability to submit new claims to Medicare and Medicaid is expected to be suspended.

64.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that within the SUBJECT PREMISES there is evidence of crimes – specifically, evidence of violations of 18 U.S.C. §§ 1341, 1343 and 1347.

## CONCLUSION AND APPLICATION

65.    Based upon my training and experience, as well as my analysis of the Medicare and Medicaid claims, witness interviews and consensual recording, as detailed in part above, in paragraphs 18 through 45 above, there is probable cause to believe that the defendant XIAOLIANG ZHANG engaged in a scheme to defraud Medicare, Medicaid and private insurers by submitting false and fraudulent claims for the provision of physical therapy treatments when such treatments were not medically necessary, were often not provided, and otherwise did not qualify for reimbursement.

66.    WHEREFORE, it is respectfully requested that the Court issue a warrant for the arrest of the defendant XIAOLIANG ZHANG so that he may be brought before the Court and dealt with according to law.

67.    Further there is reasonable cause to believe that there is now contained within the SUBJECT PREMISES items described in Attachment A, all of which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1341, 1343 and 1347.

68.    WHEREFORE, it if further respectfully requested that the Court issue search warrants for SUBJECT PREMISES I and SUBJECT PREMISES II, as described in paragraphs 15 through 17, respectively, authorizing the search and seizure, in according with the details of paragraphs 47 through 64, of the items described in Attachment A, all of which

36

constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1341, 1343 and 1347.

       69.    Additionally, a copy of a patient's medical record will be provided to any patients who so requests.

       70.    It is further respectfully requested that this Court issue an order sealing, until such time as an arrest of the defendant is effectuated and search warrants are executed, all papers submitted in support of this application, including the affidavit, application, arrest warrant and search warrants. I believe that sealing these documents is necessary, because the items and information to be seized are relevant to an ongoing investigation. If the defendant, who has roots in China, were made aware of the contents of this affidavit prior to his arrest, he might flee the jurisdiction, hide or destroy evidence or tamper with witnesses, many of whom are his employees. Thus, premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

AGNIESZKA ZAJAC
Special Agent, HHS-OIG

Sworn to before me this
10th day of July, 2017

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property to be Seized

1.      Property related to the provision of medical and physical therapy services for patients for whom claims were submitted to Medicare and Medicaid by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., all of which constitute evidence, fruits and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347, including, but not limited to:[1]

        a.      Documents constituting, concerning, or relating to patient files, sign-in sheets, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms, explanations of medical benefits, dispensing orders, physical therapy notes, patient evaluations, detailed written orders or prescriptions, certificates of medical necessity, information from physicians and physical therapists concerning patients' diagnosis, superbills or "face sheets," indicating what procedures were performed for particular patients, and proof of delivery of services and/or items;

        b.      All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to the providing of medical and physical therapy services by Elmhurst United Medical, P.C. and XIAOLANG ZHANG, M.D., to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts;

---

[1] For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

c.   All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals who may have received health care services from Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

d.   All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare, Medicaid or any other health insurance provider concerning Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

e.   All correspondence to and from Medicare, Medicaid or any other health insurance provider concerning Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., but not limited to, manuals, advisories, newsletters, bulletins, and publications;

f.   All correspondence to and from patients who may have received medial or physical therapy services from Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

g.   Financial books and records and documents constituting, concerning, or relating to Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., including but not limited to:

(1)   bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

(2)   Credit card/ATM/debit card accounts.

h.   All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals or storage for Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., to include, but not limited to, records of payment by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

     i.      All employee files and resumes relating to Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.  This may include, but is not limited to, any handwritten or computer files listing any and all employee names addresses, telephone numbers and background information for all current and former employees;

     j.      All contracts, agreements or paper affiliated with any medical insurance billing company for Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.; and

     k.      All applications for enrollment in any health care program by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

     2.      Computers[2] or storage media[3] that contain records or information (hereinafter "COMPUTERS") used as a means to commit violations of Title 18, United States Code, Sections 1341, 1343, and 1347.  All information obtained from such COMPUTERS will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution.  The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code, Section 1341, 1343 and 1347, including:

     a.      evidence of who used, owned, or controlled the COMPUTERS at the time the things described in this warrant were created, edited or deleted, such as logs, registry entries,

---

[2] A computer includes all types of electronic, magnetic, optical, electrochemical or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers and network hardware, such as wireless routers.

[3] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.  Examples include external hard drives, CDs, DVDs and flash drives.

configuration files, saved usernames and passwords, documents, browsing history, user profiles,

email, email contacts, instant messaging logs, photographs and correspondence;

        b.      evidence of software that would allow others to control the

COMPUTERS, such as viruses, Trojan horses and other forms of malicious software, as well as

evidence of the presence or absence of security software designed to detect malicious software;

        c.      evidence of the lack of such malicious software;

        d.      evidence of the attachment to the COMPUTERS of other storage devices

or similar containers for electronic evidence;

        e.      evidence of counter-forensic programs (and associated data) that are

designed to eliminate data from the COMPUTER;

        f.      evidence of the times the COMPUTERS were used;

        g.      passwords, encryption keys and other access devices that may be

necessary to access the COMPUTERS;

        h.      documentation and manuals that may be necessary to access the

COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

        i.      contextual information necessary to understand the evidence described in

this Attachment.

# ATTACHMENT A

## Property to be Seized

1.      Property related to the provision of medical and physical therapy services for patients for whom claims were submitted to Medicare and Medicaid by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., all of which constitute evidence, fruits and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347, including, but not limited to:[1]

a.      Documents constituting, concerning, or relating to patient files, sign-in sheets, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms, explanations of medical benefits, dispensing orders, physical therapy notes, patient evaluations, detailed written orders or prescriptions, certificates of medical necessity, information from physicians and physical therapists concerning patients' diagnosis, superbills or "face sheets," indicating what procedures were performed for particular patients, and proof of delivery of services and/or items;

b.      All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to the providing of medical and physical therapy services by Elmhurst United Medical, P.C. and XIAOLANG ZHANG, M.D., to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts;

---

[1]  For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

c.      All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals who may have received health care services from Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

d.      All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare, Medicaid or any other health insurance provider concerning Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

e.      All correspondence to and from Medicare, Medicaid or any other health insurance provider concerning Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., but not limited to, manuals, advisories, newsletters, bulletins, and publications;

f.      All correspondence to and from patients who may have received medial or physical therapy services from Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

g.      Financial books and records and documents constituting, concerning, or relating to Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., including but not limited to:

(1)      bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

(2)      Credit card/ATM/debit card accounts.

h.      All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals or storage for Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D., to include, but not limited to, records of payment by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

      i.        All employee files and resumes relating to Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.  This may include, but is not limited to, any handwritten or computer files listing any and all employee names addresses, telephone numbers and background information for all current and former employees;

      j.        All contracts, agreements or paper affiliated with any medical insurance billing company for Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.; and

      k.        All applications for enrollment in any health care program by Elmhurst United Medical, P.C. and XIAOLIANG ZHANG, M.D.;

      2.        Computers[2] or storage media[3] that contain records or information (hereinafter "COMPUTERS") used as a means to commit violations of Title 18, United States Code, Sections 1341, 1343, and 1347.  All information obtained from such COMPUTERS will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution.  The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code, Section 1341, 1343 and 1347, including:

      a.        evidence of who used, owned, or controlled the COMPUTERS at the time the things described in this warrant were created, edited or deleted, such as logs, registry entries,

---

[2] A computer includes all types of electronic, magnetic, optical, electrochemical or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers and network hardware, such as wireless routers.

[3] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.  Examples include external hard drives, CDs, DVDs and flash drives.

configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs and correspondence;

        b.       evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.       evidence of the lack of such malicious software;

        d.       evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

        e.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

        f.       evidence of the times the COMPUTERS were used;

        g.       passwords, encryption keys and other access devices that may be necessary to access the COMPUTERS;

        h.       documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

        i.       contextual information necessary to understand the evidence described in this Attachment.

# EXHIBIT A



**EXHIBIT B**



# EXHIBIT C

1 Total-46   New-(4   Susan-23
Jiang-20

**Lꞏ  urst United Medical PC**
45-02 82nd Street 1FL Elmhurst, NY 11373
Tel: 718-893-3555 Fax: 718-893-0454

11/24/14   圖-   *MON.*  **Physical Therapy**   物理治療   4-7 pn

| # | Print Name (寫名字) | # | Print Name (寫名字) |
|---|---|---|---|
| 1 | 今 | 26 | X Chenga |
| 2 | Ma | 27 | JIN 24EN |
| 3 | WANG | 28 | RONA, |
| 4 | Lin. | 29 | XiaoLi, |
| 5 | CHEN | 30 | Bebe |
| 6 | MuNARNA | 31 | ROKEYA |
| 7 | Yusapova | 32 | Zhao |
| 8 | CHENG | 33 | Patel |
| 9 | XU ZIEN | 34 | Sharim |
| 10 | Yang | 35 | MURSHIDA |
| 11 |  | 36 | Mar |
| 12 | MEI | 37 | Ramendra |
| 13 | Saying | 38 | He |
| 14 | XI TinG | 39 | Monani |
| 15 | Xueping | 40 | Arya |
| 16 | MiNg Ying | 41 | WANCHAI |
| 17 | Yong | 42 | Yu Ping |
| 18 | Norgis | 43 | MARIOU |
| 19 | Fang | 44 | Tahmina |
| 20 | April | 45 | Shahida |
| 21 | marie | 46 | Ying |
| 22 | XU | 47 | |
| 23 | Afordita | 48 | |
| 24 | SUI WANG | 49 | |
| 25 | HARPREET | 50 | |

# EXHIBIT D

| DOS | Mcaid | Duals | Mcare | Total Hours | Medicare Paid to Provider | Medicaid EFS |
|---|---|---|---|---|---|---|
| 12/27/2014 | 98.81 | 0.89 | 10.17 | 109.87 | $1,300.05 | $25.22 |
| 5/2/2015 | 101.23 | 1 | 5.9 | 108.13 | $1,539.81 | $63.43 |
| 12/31/2014 | 93.98 | 0.91 | 8.18 | 103.07 | $1,693.59 | $33.54 |
| 4/18/2015 | 85.67 | 2.25 | 11.52 | 99.44 | $2,111.83 | $373.27 |
| 12/28/2015 | 93.76 | | 5.57 | 99.33 | $1,487.63 | $0.00 |
| 12/20/2014 | 89.21 | 0.5 | 8.86 | 98.57 | $1,843.66 | $46.75 |
| 7/23/2015 | 83.45 | 0.5 | 12.95 | 96.9 | $2,275.29 | $17.86 |
| 12/29/2014 | 90.6 | | 5.23 | 95.83 | $327.78 | $0.00 |
| 12/24/2014 | 90.29 | 0.25 | 4.61 | 95.15 | $1,117.60 | $25.22 |
| 5/5/2015 | 84.56 | 0.5 | 9.89 | 94.95 | $1,267.23 | $52.88 |
| 5/26/2015 | 81.97 | 0.66 | 11.16 | 93.79 | $1,873.11 | $36.03 |
| 7/6/2015 | 86.8 | | 6.54 | 93.34 | $560.14 | $0.00 |
| 5/16/2015 | 84.75 | 0.5 | 8.08 | 93.33 | $1,388.30 | $54.56 |
| 12/22/2014 | 88.03 | 0.25 | 4.8 | 93.08 | $1,140.18 | $24.20 |
| 5/4/2015 | 82.43 | | 10.5 | 92.93 | $1,156.50 | $0.00 |
| 4/11/2015 | 84.44 | 0.91 | 6.57 | 91.92 | $1,633.72 | $55.38 |
| 4/21/2015 | 81.06 | 0.25 | 10.52 | 91.83 | $1,089.92 | $27.28 |
| 5/11/2015 | 79.56 | | 11.9 | 91.46 | $1,761.02 | $0.00 |
| 6/3/2015 | 82.45 | 0.75 | 8.2 | 91.4 | $1,693.92 | $65.49 |
| 9/21/2015 | 79.65 | 0.5 | 9.81 | 89.96 | $1,297.07 | $0.00 |
| 5/9/2015 | 84.14 | | 5.51 | 89.65 | $431.14 | $0.00 |
| 4/27/2015 | 81.66 | | 7.94 | 89.6 | $917.05 | $0.00 |
| 12/30/2014 | 83.77 | | 5.27 | 89.04 | $523.46 | $0.00 |
| 8/4/2015 | 76.13 | | 12.65 | 88.78 | $1,982.40 | $17.86 |
| 4/2/2015 | 70.12 | 0.41 | 17.86 | 88.39 | $1,929.66 | $15.24 |
| 8/1/2015 | 81.22 | | 7.06 | 88.28 | $912.11 | $29.00 |
| 6/16/2015 | 83.61 | | 4.48 | 88.09 | $405.94 | $0.00 |
| 8/6/2015 | 73.99 | 0.25 | 13.55 | 87.79 | $2,297.41 | $35.72 |
| 7/7/2015 | 80.61 | 0.25 | 6.9 | 87.76 | $1,543.99 | $35.72 |
| 5/12/2015 | 79.25 | | 8.21 | 87.46 | $574.35 | $0.00 |
| 6/29/2015 | 77.39 | | 9.77 | 87.16 | $931.80 | $0.00 |
| 12/6/2014 | 78.617 | 1.39 | 7.06 | 87.067 | $2,438.65 | $93.94 |
| 4/25/2015 | 76.91 | 1.25 | 8.84 | 87 | $2,468.67 | $147.80 |
| 5/18/2015 | 75.95 | 0.25 | 10.77 | 86.97 | $2,240.48 | $31.08 |
| 12/18/2014 | 74.34 | 1.14 | 11.29 | 86.77 | $2,344.16 | $45.58 |
| 5/27/2015 | 74.25 | 1.5 | 10.76 | 86.51 | $2,394.48 | $65.20 |
| 12/15/2014 | 79.97 | | 6.54 | 86.51 | $716.87 | $0.00 |
| 6/6/2015 | 76.17 | 1 | 9.23 | 86.4 | $2,210.77 | $87.75 |
| 12/14/2015 | 81.26 | | 4.91 | 86.17 | $929.61 | $0.00 |
| 4/14/2015 | 79.6 | 0.25 | 6.29 | 86.14 | $1,271.87 | $27.28 |
| 6/17/2015 | 73.27 | 2.2 | 10.62 | 86.09 | $2,075.41 | $217.95 |
| 8/10/2015 | 75.04 | | 10.77 | 85.81 | $1,918.14 | $17.86 |
| 6/24/2016 | 71.12 | 0.75 | 13.7 | 85.57 | $2,284.38 | $61.69 |
| 6/25/2015 | 70.91 | 1.5 | 12.72 | 85.13 | $2,371.06 | $71.64 |
| 6/8/2015 | 73.14 | 1 | 10.12 | 84.26 | $2,152.93 | $38.72 |
| 4/4/2015 | 77.29 | 0.91 | 5.28 | 83.48 | $1,638.03 | $58.58 |